**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

THERESA BAKER                          :
                                       :
v.                                     :     Civil Action WMN-06-1365
                                       :
ANNE ARUNDEL COUNTY, <u>et al.</u>     :

**MEMORANDUM**

Plaintiff filed this action on May 26, 2006. On September 25, 2006, Defendants filed a motion to dismiss, or in the alternative, for summary judgment, to which Plaintiff responded with both an opposition, and then an amended complaint. Defendants have now filed a motion to dismiss the amended complaint, or in the alternative, for summary judgment. Paper No. 12. This motion is now fully briefed. Upon a review of the motion and the applicable case law, the Court determines that no hearing is necessary, Local Rule 105.6, and that the motion should be granted in part and denied in part.

This action arises out of an incident that occurred on March 17, 2005.[1] Although the Amended Complaint is scant in detail, it is alleged that Defendants Snopeck, Raiford, and Quigley - all Anne Arundel County police officers - entered Plaintiff's home for the purpose of taking Plaintiff into custody and having her

---

[1] The Amended Complaint states that the incident occurred on March 17, 2006. From the other evidence, however, it is clear that this is a typographical error and the incident in question occurred on March 17, 2005.

submit to a mental examination.  Plaintiff alleges that after gaining access to her home, Defendants Raiford and Snopek "brutally, forcibly and maliciously twisted the Plaintiff's left arm behind her back, thereby causing her to sustain severe and permanent physical injuries."  Am. Compl. ¶ 2.[2]

In a brief sworn statement attached to her opposition to the first motion to dismiss, Plaintiff provides some elaboration.

> On the afternoon of March 17, 2006,[3] I was resting in my bedroom when I heard people in the living room.  Wondering who was in my home, I got up from the bed and started to walk around to the door.  When I reached the bottom of the bed, three police officers, Snopek, Quigley, and Raiford entered the room and stood around me.  The officers were yelling their names and yelling my name.  I was calm, but still had no idea what was happening and the police officers did not explain to me the reason they were there.  The police officers seemed to be in a highly agitated state, for no apparent reason.
>
> The police officer standing directly in front of me stated that he was going to handcuff me.  He grabbed my right, upper arm with his right hand and then grabbed my lower, right arm with his left hand and twisted my arm behind my back in a malicious and violent hostile manner.  The degree of force used by Officer Snopek and Quigley was unreasonable, unnecessary and to such a degree that it was clear that he was acting with ill will and intent to injure me.  When this happened my arm broke.  There was a very loud snapping noise.  When this happened my knees buckled and I collapsed forward onto

---

[2] The Complaint includes numbered paragraphs 1 through 6, and then proceeds to restart its numbering with paragraph 1.  All references in this memorandum, unless otherwise noted, refer to paragraphs in the second sequence of numbered paragraphs.

[3] Plaintiff again erroneously identifies the date.

2

>           the floor.  I started to shout that he had
>           broken my arm and that I was in an extreme
>           amount of pain.  I was lying on my stomach
>           and the officer that grabbed my arm knelt
>           down on my right side and pushed his left
>           knee into my back and he continued to pull
>           back on my right arm.  He was pulling on my
>           arm so hard that I thought the broken bone
>           was going to break through my skin.  I
>           continued to yell "You broke my arm!" over
>           and over.  At this point Roy Bell, who was
>           also in the room said, "You broke her arm,
>           didn't you hear that snap?"  One of the
>           officers then stated ["]I did, did you?"  All
>           of a sudden everything stopped when they
>           admitted they all heard it.  They had finally
>           realized that I was seriously injured.

Baker Statement, Ex. 1 to Paper No. 9.  Plaintiff also submitted a letter from her treating physician confirming that Plaintiff's arm was broken and detailing the complications attendant to the injury.  Letter of Dr. Janet Conway dated Oct. 18, 2005, Ex. 2 to Paper No. 9.

Based upon this incident, Plaintiff asserts three claims under 42 U.S.C § 1983: a claim for excessive force against Raiford, Snopeck, and Quigley (Count I); a claim for "supervisory liability" against Anne Arundel County (the County) (Count II); and a claim based upon the alleged "policy and practice of providing poor training, discipline and supervision" against the County and P.T. Shanahan, the Chief of Police for County (Count III).  In addition, Plaintiff asserts the following state law claims: negligent failure to train against the County (Count IV); violation of Articles 24 and 26 of the Maryland Constitution against all defendants (Count V); assault and battery against all defendants (Count VI); and intentional infliction of emotional

3

distress against Sponeck, Raiford and Quigley (Count VII).

## II. LEGAL STANDARD

Defendant has moved to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56 as to all claims.  A court considers only the pleadings when deciding a Rule 12(b)(6) motion.  Where the parties present matters outside of the pleadings and the court considers those matters, as here, the motion is treated as one for summary judgment.  See Fed. R. Civ. P. 12(b); Gadsby by Gadsby v. Grasmick, 109 F.3d 940, 949 (4th Cir. 1997); Paukstis v. Kenwood Golf & Country Club, Inc., 241 F. Supp. 2d 551, 556 (D. Md. 2003).

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate.  Anderson, 477 U.S. at 250; see also Pulliam Inv. Co. v. Cameo Props., 810 F.2d 1282, 1286 (4th Cir. 1987).  The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Catawba Indian Tribe of S.C. v. South Carolina,

4

978 F.2d 1334, 1339 (4th Cir. 1992).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  See United States v. Diebold, 369 U.S. 654, 655 (1962); Gill v. Rollins Protective Servs. Co., 773 F.2d 592, 595 (4th Cir. 1985).  A party who bears the burden of proof on a particular claim must factually support each element of his or her claim.  "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial."  Celotex Corp., 477 U.S. at 323.  Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial.  *See* Anderson, 477 U.S. at 256; Celotex Corp., 477 U.S. at 324.  However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment."  Detrick v. Panalpina, Inc., 108 F.3d 529, 536 (4th Cir. 1997).  There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (citations omitted).

**III. DISCUSSION**

    A. Section 1983 Claims

        1. Liability of Defendant Quigley

Defendants move to dismiss all claims against Officer Quigley on the ground that Plaintiff does not allege that he "actually placed his hands on Plaintiff at any time." Mot. 8. Plaintiff's narrative of the incident, cited above, seems consistent with the conclusion that Quigley never used any force on Plaintiff, much less unreasonable force. In opposing the motion, Plaintiff cites a line of cases, predominately from the Ninth Circuit, that permit the imposition of liability for damages from constitutional violations if the defendant was an "integral participant" in the activities that resulted in the constitutional violation. Opp. 3.[4] Defendants argues that the cases cited are factually distinguishable and also question if the Fourth Circuit would embrace the "integral participant" doctrine. The Court need not resolve these issues, however, as it finds that Plaintiff has stated a claim against Quigley under an alternative theory of liability that unquestionably has been adopted by the Fourth Circuit.

In Randall v. Prince George's County, 302 F.3d 188 (4th Cir. 2002), the Fourth Circuit, following the lead of several of its sister circuits, recognized the validity of "bystander liability" under § 1983. The Fourth Circuit observed that an officer possesses "'an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law

---

[4] Plaintiff cites, inter alia, Jones v. Williams, 297 F.3d 930 (9th Cir. 2002); Churnan v. Wright, 76 F.3d 292 (9th Cir. 1996); and Rutherford v. City of Berkley, 780 F.2d 1444 (9th Cir. 1986).

enforcement officers.'. . . [S]uch a duty attaches when an officer observes or has reason to know that a 'constitutional violation [is being] committed' by other officers and possesses 'a realistic opportunity to intervene to prevent the harm from occurring.'" Randall, 302 F.3d at 203-04 (quoting Anderson v. Branen, 17 F.3d 552, 557 (7th Cir. 1994)).  The court explained, "'it is clear that one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge.'"  Randall at 204 (quoting Bryd v. Brishke, 466 F.2d 6, 11 (7th Cir. 1972)). "Any rule to the contrary would permit officers to ignore their duty to enforce the law.  Therefore, an officer may be liable under § 1983, on a theory of bystander liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act."  Randall at 204.

Here, if the factfinder were to conclude that Raiford and Snopeck violated Plaintiff's constitutional rights in the manner in which they employed force against her, the factfinder could also conclude, under the facts alleged, that Quigley could have objected to that conduct and had a reasonable opportunity to prevent the harm and yet chose not to act.[5]

---

[5] Plaintiff has not identified and the Court is not independently aware of any similar doctrine that would impose liability on Quigley under state tort law for his alleged omission.  Accordingly, Quigley is entitled to have the state

2. Section 1983 Claims Against The County and Shanahan

It is well settled that "a municipality cannot be held liable solely because it employs a tortfeasor - or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 691 (1978) (emphasis in original). A plaintiff can establish liability against a municipality, however, by showing that her injury was the result of some official policy or custom of the municipality. For a governmental "custom" to form the basis of § 1983 liability, the practice must be so "persistent" and "widespread" that, "[a]lthough not authorized by written law, [it] could well be so permanent and well settled as to have the force of law." Id. at 691. Applying this Monell doctrine, the Supreme Court has held that the "inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train in a relevant respect amounts to deliberate indifference to the constitutional rights of persons with whom the police come into contact." City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989). The Court explained, "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been

---

common law tort claims asserted against him dismissed, regardless of any liability on the part of the other officers.

deliberately indifferent to the need." <u>Id.</u> at 390.

In Count II, Plaintiff alleges that the County failed "to properly train and supervise its employees in the use of force." Am. Compl. ¶ 5.  In Count III, Plaintiff alleges that Shanahan and the County "promulgat[ed] a <u>de facto</u> policy and practice of providing poor training, discipline, and supervision of county police officers with regard to the use of force." <u>Id.</u> ¶ 8.  In her opposition to Defendants' motion, Plaintiff clarifies that the gravamen of her claims in these two counts is that the County failed to provide special training to its officers regarding the use of force in dealing with mental health patients or those for whom a mental health examination has been ordered in addition to the more general training it provides pertaining to the use of force when placing criminals under arrest. Opp. 5.  Plaintiff cites no examples of other claims or incidents of excessive force involving persons suspected of mental illness but simply argues that, "given the brute force in which the Defendant officers attempted to take her into custody, for the purpose of a mental health examination, there was obviously deficient training provided by Chief Shanahan. . . ." <u>Id.</u> 6.

In fact, Anne Arundel County has a comprehensive program for training officers for interactions with individuals that might be mentally ill and for handling emergency evaluations.  Defendants have submitted to the Court copies of some of the written materials used in that training, along with evidence that each of the three defendant officers successfully completed that training

prior to the incident in question.  Reply Exs. 1-8.  In light of this substantial evidence of specialized training of County police officers concerning their interactions with mentally ill individuals, along with the absence of any allegations of similar occurrences, the Court finds that Shanahan and the County are entitled to judgment on the § 1983 claims brought against them.

### 3. Qualified Immunity and the Individual Officers

In an excessive force case, the entitlement to qualified immunity must be analyzed in two steps, which are to be "considered in proper sequence." Saucier v. Katz, 533 U.S. 194, 200 (2001). First, the court must resolve the issue as to whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show [that] the officer's conduct violated a constitutional right." Id. at 201. "If no constitutional right would have been violated," even when the facts are viewed in the best light for the injured plaintiff, the analysis ends; the plaintiff cannot prevail. Id. If, however, taking the evidence in the best light for the plaintiff, the plaintiff has stated a violation of a constitutional right, the court must proceed to the second step, i.e., determining whether the right was "clearly established" at the time of the events at issue. Id. If not, the qualified immunity doctrine still provides a defendant officer with immunity from suit. If so, summary judgment must be denied.[6]

---

[6] Plaintiff erroneously argues that qualified immunity "involves both a subjective as well as an objective element."

To support their assertion of qualified immunity, the defendant officers submit their official "Incident Reports." Mot. Ex 3.  In those reports, the officers state that Plaintiff refused to go with the officers, resisted when they attempted to handcuff her, ignored orders to stop resisting, attempted to pull her arm away, kicked her legs and turned from side to side, and continued to fight with the officers after she dropped her body to the ground.  Id.   Plaintiff, however, describes a very different scene.  She states that she was "calm," the officers "seemed to be in an highly agitated state, for no apparent reason," and the amount of force used against her was "unnecessary."   Ex. 1 to Paper No. 9.

Certainly, if the events were as the officers describe, they would be entitled to immunity.  At this stage in the litigation, however, the Court must view the evidence in the light most favorable to Plaintiff.  Under her version, one could draw the conclusion that the officers violently wrenched back Plaintiff's arm, with sufficient force to break Plaintiff's arm despite the lack of any resistence.  Plaintiff's testimony, albeit limited, is enough to create a dispute of fact as to whether the individual officers are immune from liability and thus the Court

---

Opp. 6 (citing Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982)). In Harlow, the Supreme Court expressly eliminated the subjective aspect of the qualified immunity analysis. Harlow, 457 U.S. at 815-16; see also Crawford-El v. Britton, 523 U.S. 574, 587-88 (1998) (discussing Harlow and observing that "[e]vidence concerning the defendant's subjective intent is simply irrelevant" to the defense of qualified immunity).

11

must deny their motion for summary judgment on this issue at this time.  In their reply memorandum, the Defendants implicitly acknowledge the dispute of material facts by asserting that "Plaintiff's opposition contains many inaccuracies" concerning her seizure, and then proceeding to argue their entitlement to immunity based upon their own version of the facts.  See, e.g., Reply 7 ("Officers Snopek and Quigley acted appropriately to take Plaintiff into custody when she resisted . . .").[7]

### B. State Law Claims

#### 1. State Law Claims Against the County

The Complaint includes claims against the County for Negligent Failure to Train (Count IV) and Assault/Battery (Count VI).  Unlike state governments which enjoy under the common law a total immunity from tort liability, a municipality is entitled to governmental immunity only when the alleged tortious conduct occurred while the municipality was exercising a "governmental"

---

[7] The Court is cognizant that "qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation' and that immunity questions must be resolved 'at the earliest possible stage in litigation.'"  Saucier v. Katz, 533 U.S. at 200-01 (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).  The limited detail and scope of Plaintiff's statement allows her to avoid Defendants' qualified immunity defense more by inference than by affirmative statement.  She does not explicitly state that she did not resist the officers but, given her statement that she was "calm" and the officer's use of force was "unnecessary," the Court must, at this stage in the litigation, infer that she did not.  Once Plaintiff, the officers, and the other witnesses in the room at the time of the incident are deposed, a more complete picture of the incident may allow the Court to reach a different conclusion on a more fully supported motion for summary judgment.

12

rather than a "propriety" function. Buffington v. Baltimore Co., 913 F.2d 113, 124 n.6 (4th Cir. 1990); Carey v. Baltimore Co., 278 A.2d 6, 8 (Md. 1971). There is no genuine dispute that a municipality's operation of a police department is a governmental function, Quecedo v. Montgomery Co., 287 A.2d 257, 260-61 (Md. 1972), and Plaintiff makes no argument to the contrary.

Plaintiff does argue that the Local Government Tort Claims Act (LGTCA), Md. Code Ann., Cts. & Jud. Proc. § 5-301, et seq. (2002 repl. vol.), "provides for a waiver of sovereign immunity to allow recovery against local governments in certain instances, e.g., to indemnify employees for judgments entered against them in the scope of their duties." Opp. 8. While that is true, as Plaintiff concedes, the LGTCA does not authorize a direct action against a local government. See Martino v. Bell, 40 F. Supp. 2d 719, 723 (D. Md. 1999). Accordingly, the claims against the County in Counts IV and VI will be dismissed.

### 2. Public Official Immunity for the Assault/Battery Claim

A governmental representative is entitled to public official immunity under the common law when he or she is acting as a public official, when the tortious conduct occurred while that person was performing discretionary rather than ministerial acts, and when the representative acted without malice. See Lovelace v. Anderson, 785 A.2d 726, 739 (Md. 2001) (citing James v. Prince George's County, 418 A.2d 1173, 1178 (Md. 1980)); Williams v. Mayor & City Council of Baltimore, 753 A.2d 41, 61 (Md. 2000). There is no dispute that a police officer is a public official.

Robinson v. Board of County Comm'rs, 278 A.2d 71, 74 (Md. 1971). Nor is there any dispute that, in taking an individual into custody, the officers were performing a discretionary act. Thus, the only issue that remains with regard to public official immunity is whether the officers acted with malice.

"Malice" is established by proof that the defendant "intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff." Leese v. Baltimore, Co., 497 A.2d 159, 179 (Md. App. 1985), overruled on other grounds, Harford County v. Town of Bel Air, 704 A.2d 421 (1998). "Actual malice does not always have to be shown with specificity; it can be inferred." Id. (citing Henderson v. Maryland Nat'l Bank, 366 A.2d 1, 6 (Md. 1976)). Although a close call, the Court finds the details of Plaintiff's account sufficient to raise an inference of malice. See Okwa v. Harper, 757 A.2d 118, 129 (Md. 2000) (holding that entry of summary judgment was not appropriate where the record contained "two diametrically opposed versions of the circumstances surrounding [the plaintiff's] arrest" -- defendant officers claimed plaintiff was "jerking from side to side" and kicking, but plaintiff submitted affidavit stating "at no time did [he] resist the officers"). Again, that conclusion is subject to change once Plaintiff is required to provide a more complete picture of the encounter. See, supra, 13 n.7.

### 3. Intentional Infliction of Emotional Distress Claim

14

The Maryland Court of Appeals first recognized a cause of action for intentional infliction of emotional distress in <u>Harris v. Jones</u>, 380 A.2d 611 (Md. 1977).  For conduct to give rise to liability under this cause of action: (1) the conduct must be intentional or reckless, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress must be severe.  <u>Id.</u> at 613.  While recognizing the tort, Maryland courts have placed significant limits upon its reach.  The Court of Appeals emphasized in <u>Kentucky Fried Chicken Nat'l Mgmt. Co. v. Weathersby</u>, 607 A.2d 8 (Md. 1992), that "the tort is to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct . . . .  Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."  607 A.2d at 11 (citing <u>Batson v. Shiflett</u>, 602 A.2d 1191 (Md. 1992)).

The Court finds that the conduct in question, even accepting Plaintiff's version of events, does not meet that high standard of extremity.  In a recent decision from the Maryland Court of Special Appeals, <u>Hines v. French</u>, 852 A.2d 1047, 1060 (Md. App. 2004), a plaintiff brought an intentional infliction of emotion distress claim against a police officer under facts certainly equatable with those presented here.  In <u>Hines</u>, the defendant

15

officer pulled over the vehicle driven by the plaintiff believing that it had been involved in a hit and run accident.  Under the plaintiff's version of the events,

> as she exited the vehicle, the officer noted that she had scars [from a recent TMJ surgery] on her right jaw, and that she must be in pain, as they were so fresh.  He then grabbed her and threw her up against the side of the truck and, after slamming her head into the side of the truck, while laughing, [] told [her] that it must have really hurt when her face hit the side of the truck. [The officer] then pulled her crippled left arm up behind her back and handcuffed her hands so tightly that appellant suffered lacerations on her wrists and hands.

852 A.2d at 1053.  Under these facts, the Court of Special Appeals upheld the trial court's grant of summary judgment in favor of the officer on the intentional infliction claim concluding that, "[a]lthough such behavior, if true, was inappropriate, it is not tantamount to 'atrocious and utterly intolerable' behavior that goes 'beyond all possible bounds of decency.'"  Id. at 1060.[8]

### 4. Violation of State Constitution

Defendants raise two arguments for the dismissal of the state constitutional tort claims.  First, Defendants argue that "Plaintiff was taken into custody pursuant to a valid court order."  Mot. 33.  Plaintiff, however, does not dispute the

---

[8] This Court notes that, while the Court of Special Appeals held that this conduct was insufficient to support a claim for intentional infliction of emotional distress, it found that same conduct was sufficient to create an inference of malice. Hines, 852 A.2d at 1063.

16

validity of the court order, only the means by which it was executed.  Opp. 10.  If the force used to take Plaintiff into custody was excessive,   the validity of the order is irrelevant.

Second, Defendants argue that because, in their view, Plaintiff failed to state a claim under the United States Constitution, the claims pled under the Maryland Constitution must fail as well.  Mot. 33.  Defendants are correct that the constitutional rights contained in the state constitution and those in the federal constitution (or at least those rights alleged to have been violated in this action) are held to be <u>in pari material</u>.  <u>Gadson v. State</u>, 668 A.2d 22, 26 (Md. 1995). Because the Court concludes, on the current record, that a jury could find that the individual officers violated Plaintiff's federal constitutional rights, the jury could also find that Plaintiff has established a state constitutional tort.

The Court notes that, while the protections afforded by the state constitution mirror those of the federal constitution, the rules governing the remedies for violations differ.  For one, "unlike in a § 1983 action and unlike in an action for some common law torts, neither the local government official nor a local government entity has available any governmental immunity in an action based on rights protected by the State Constitution."  <u>Dipino v. Davis</u>, 729 A.2d 354, 371 (Md. 1999). In addition, unlike claims under § 1983, there is respondeat superior liability for local government entities for state constitutional violations committed by their officials.  <u>Id.</u>, 729

A.2d at 372.  Accordingly, the state constitutional claims will go forward against all of the Defendants.

### 5. Immunity Under § 10-629 of Maryland's Health General Article

As a final argument, Defendants contend that the Defendant Officers are immune from liability under Md. Code Ann., Health Gen. § 10-629(b), which provides that "[a]ny peace officer who acts as a custodian of an emergency evaluee shall have the immunity from liability described under § 5-624(c) of the Courts and Judicial Proceedings Article."  The referenced statute provides simply that "[a]ny peace officer who, in good faith and with reasonable grounds, acts as a custodian of an emergency evaluee is not civilly or criminally liable <u>for acting as a custodian</u>."  Md. Code Ann., Cts. & Jud. Proc. § 5-624(c) (emphasis added).  The Court does not read this language as broadly as do Defendants.  While this statutory immunity may provide protection for officers from liability arising from the decision whether to act and take custody of an individual, it cannot provide carte blanche protection for the manner in which the person is taken into custody.

## IV. CONCLUSION

For the reasons stated above, the Court will allow the following claims to go forward: Count I - excessive force claim under § 1983 against officers Snopek, Raiford, and Quigley; Count V - state constitutional tort against all Defendants; and Count VI - assault and battery against officers Snopek and Raiford. All other claims are dismissed.  A separate order will issue.

```
                              _____/s/_____
                              William M. Nickerson
                              Senior United States District Judge
```

Dated: January 18, 2007